**Return Address:**
**Rabo Agrifinance, Inc.**
**10100 Trinity Parkway, Suite 400**
**Stockton, CA 95219**

Zona G. Lenhart, Auditor, Franklin County, WA.
AFN # **1740144** Recorded 09/18/2009 at 10:50 AM
DocType: MULTI 21 Page(s) Filing Instrument $268.00
Recorded at the request of: CHICAGO TITLE

CHICAGO TITLE INSURANCE
827408

Please print or type information **WASHINGTON STATE RECORDER'S Cover Sheet** (RCW 65.04)

**Document Title(s)** (or transactions contained therein): (all areas applicable to your document **must** be filled in)

1. Washington Mortgage, Security Agreement, Fixture Filing And Financing Statement

**Reference Number(s) of Documents assigned or released:**

Additional reference #'s on page n/a of document

**Mortgagor(s)** (Last name, first name, initials)
1. Easterday, Gale
2. Easterday, Karen
3. Easterday, Cody
4. Easterday, Debby
5. Easterday, Jody
6. 3E Properties

Additional names on page n/a of document.

**Mortgagee(s)** (Last name first, then first name and initials)
1. Rabo Agrifinance, Inc., as collateral agent

Additional names on page two (2) of document.

**Legal description** (abbreviated: i.e. lot, block, plat or section, township, range)

Blk 13 & 14 NP Addn

Additional legal is on page twenty (20) of document.

**Assessor's Property Tax Parcel/Account Number**      ☐ Assessor Tax # not yet assigned

112-021-017 and 113-130-040

The Auditor/Recorder will rely on the information provided on the form. The staff will not read the document to verify the accuracy or completeness of the indexing information provided herein.

I am requesting an emergency nonstandard recording for an additional fee as provided in RCW 36.18.010. I understand that the recording processing requirements may cover up or otherwise obscure some part of the text of the original document.

Signature of Requesting Party

_____  Initials _____

RETURN RECORDED DOCUMENT TO
RABO AGRIFINANCE, INC.
10100 TRINITY PARKWAY, SUITE 400
STOCKTON, CALIFORNIA 95219

Loan ███ 3058

## WASHINGTON MORTGAGE, SECURITY AGREEMENT, FIXTURE FILING AND FINANCING STATEMENT

### (REVOLVING CONSTRUCTION LINE OF CREDIT)

THIS MORTGAGE, SECURITY AGREEMENT, FIXTURE FILING AND FINANCING STATEMENT (REVOLVING LINE OF CREDIT) ("Mortgage") is made the 4th day of SEPTEMBER 2009, between 3E PROPERTIES, a Washington general partnership, GALE EASTERDAY and KAREN EASTERDAY, husband and wife, CODY EASTERDAY and DEBBY EASTERDAY, husband and wife, and JODY EASTERDAY, a married woman dealing with her sole and separate property, whose chief executive office or principal residence is P.O. BOX 2813, 1427 N. 1ST AVENUE, PASCO, WASHINGTON 99302, and all other persons executing this Mortgage (the "Mortgagor") and RABO AGRIFINANCE, INC., a corporation organized and existing under the laws of Delaware ("RAF"), whose address is P.O. Box 411995, St. Louis, Missouri 63141; RABOBANK, N.A. ("RNA"), whose address is P.O. Box 1845, El Centro, California 92244; and COOPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., "Rabobank Nederland" ("RN"), whose address is 245 Park Avenue, New York, New York 10167 (RAF, RNA, and RN, unless otherwise indicated, together with their successors and assigns, are hereinafter, individually or collectively, referred to as the "Mortgagee") and RAF as collateral agent (the "Collateral Agent") for the Mortgagee.

### NOTICE TO RECORDER

THIS DOCUMENT CONSTITUTES A FIXTURE FILING THAT SHALL HAVE AN EFFECTIVE PERIOD UNTIL THIS MORTGAGE IS RELEASED OF RECORD OR ITS EFFECTIVENESS OTHERWISE TERMINATES AS TO THE REAL PROPERTY.

THE MAXIMUM PRINCIPAL AMOUNT TO BE ADVANCED PURSUANT TO THE CONSTRUCTION NOTE DESCRIBED BELOW IS $9,500,000.00; HOWEVER, SUCH MAXIMUM AMOUNT MAY BE EXCEEDED BY PRINCIPAL ADVANCES MADE TO COMPLETE THE CONSTRUCTION OF IMPROVEMENTS UPON THE SUBJECT PROPERTY AND/OR TO PROTECT THE SECURITY OF THIS MORTGAGE.

Initials

2

**WHEREAS,** the Mortgagor is justly indebted to the Mortgagee in the aggregate sum of ELEVEN MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($11,500,000.00) with interest, or so much thereof as may be disbursed, all as set forth in that certain non-revolving line of credit promissory note and that certain credit agreement, both of even date herewith (which, together with any notes and/or guaranties and/or any Hedging Agreements containing Hedging Obligations described below, are collectively referred to as the "Note"), which is comprised of a non-revolving construction line of credit in the amount of $9,500,000.00 maturing OCTOBER 1, 2020 and an operating revolving line of credit loan in the amount of $2,000,000.00 maturing August 31, 2010.

**NON-REVOLVING LINE OF CREDIT.** Specifically, and without limitation, this Mortgage secures a non-revolving construction line of credit (which may have a variable rate of interest) which obligates Collateral Agent or Mortgagee to make advances to Mortgagor so long as Mortgagor complies with all the terms of the Note and Building and Loan Agreement dated as of September 4, 2009, and the line of credit has not been terminated, suspended or cancelled.

**REVOLVING LINE OF CREDIT.** Specifically, and without limitation, this Mortgage also secures a revolving line of credit (which may have a variable rate of interest) which obligates Collateral Agent or Mortgagee to make advances to Mortgagor so long as Mortgagor complies with all the terms of the Note and the line of credit has not been terminated, suspended or cancelled. Funds may be advanced by Collateral Agent or Mortgagee, repaid, and subsequently readvanced. The unpaid balance of the revolving line of credit may at certain times be lower than the amount shown or zero. A zero balance does not terminate the line of credit or terminate Collateral Agent's or Mortgagee's obligation to advance funds to Mortgagor. Therefore, the lien of this Mortgage will remain in full force and effect notwithstanding any zero balance.

**FUTURE ADVANCES.** With respect to the non-revolving construction line of credit in the amount of $9,500,000.00, a certain amount has been withheld by the mortgagee at the time of closing for future disbursement (hereinafter called "Future Advance(s)"). Future Advances shall be made only upon compliance with the following conditions at the time of each Future Advance: (a) The mortgagor shall be the Owner of the premises described in this mortgage; (b) There shall be no uncured default in the note which it secures; (c) Each Future Advance shall be secured by this mortgage and shall constitute a valid first lien on the mortgaged premises, as evidenced by such title searches, abstract continuations, opinions of counsel, title policy endorsements or other evidence of title as the mortgagee may require; (d) All expenses of title searches, abstract continuations, opinions of title and title policy endorsements required by the mortgagee shall be paid by the mortgagor; (e) The mortgagor shall not be affected by any insolvency proceedings nor shall the mortgagor have made an assignment for the benefit of creditors; (f) The mortgagee shall not be obliged to make any Future Advance(s) subsequent to the October 1, 2010; and (g) Not less than thirty days' written notice shall have been given to the mortgagee prior to the intended date of each Future Advance.

3

Initials

NOW, THEREFORE, THIS MORTGAGE WITNESSETH that, to secure the payment of the principal of and interest on the Note, along with (1) payment of the entire indebtedness and other obligations evidenced by the following promissory note(s), and/or guaranty(s) executed by Mortgagor to the applicable Mortgagee or order and all modifications, amendments, replacements, substitutions, extensions and renewals thereof along with all Hedging Obligations:

[ ]    The following additional new or existing Promissory Notes:

- Note dated n/a in the stated principal amount of n/a Dollars
- Note dated n/a in the stated principal amount of n/a Dollars

[ ]    A guaranty or guaranties dated as of n/a, guaranteeing the indebtedness of the borrowers as defined in the guaranty or guaranties.

(2) the payment of such additional loans or advances and such other debts, obligations and liabilities of every kind and character, of Mortgagor or the maker of the Note, evidenced by a promissory note, guaranty or otherwise, whether one or more, now existing or arising in the future, in favor of the applicable Mortgagee, whether direct or indirect, absolute or contingent, or originally payable to the applicable Mortgagee or any other person; PROVIDED HOWEVER, THAT, such other additional loans, advances, debts, obligations and liabilities shall be secured by this Mortgage only if the promissory note, guaranty, or other document evidencing such shall recite that it is to be secured by this Mortgage; and provided, however, if the Property includes Mortgagor's principal dwelling or is otherwise a one to four family dwelling, the Property will not secure any future loan, advance, debt, obligation or liability taken or incurred principally for personal, family or household purposes; (3) the payment of any substitute notes, renewals, reamortizations, conversion agreements and extensions of all indebtedness secured by this Mortgage; (4) payment and performance of each agreement of Mortgagor in this Mortgage; (5) payment of all sums expended or advanced by Collateral Agent or Mortgagee to protect the security of this Mortgage, said real property or said collateral, with interest thereon at the rate per annum after default or maturity set forth in said Note or any Credit Agreement; (6) the words "Hedging Obligations" mean all obligations, indebtedness, and liabilities of Mortgagor to Mortgagee, or any other affiliate of Mortgagee, arising pursuant to any Hedging Agreements, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, joint, several, joint and several, including without limitation, all fees, costs, expenses (including attorney's fees and expenses) provided for in such Hedging Agreements. The words "Hedging Agreements" mean any interest rate swap, interest rate cap, interest rate collars or other similar agreement or instrument entered into by Mortgagee, or any other affiliate of Mortgagee, with Mortgagor, for the purpose of hedging interest rate risk; and (7) all obligations as defined in or provided for in any Note , and in consideration of the premises, the Mortgagor by these presents does grant, bargain, sell, convey, transfer, assign, mortgage, pledge, warrant and confirm unto the Collateral Agent for the benefit of Mortgagee all the property hereinafter described, to wit:

I.    The real property located in FRANKLIN County, Washington, briefly described as follows (the "Real Estate"): BLK 13 & 14 NP Addn

initials _____

4

Assessor's property tax parcel or account numbers: ████1-017 and ████0-040

See attached <u>Exhibit A</u> which is incorporated herein by reference.

**TOGETHER WITH** (1) all easements, rights-of-way and rights appurtenant to said Real Estate or used in connection therewith or as a means of access thereto; (2) all tenements, hereditaments and appurtenances thereto, including all water, water rights and drainage rights appertaining thereto; (3) Mortgagor's interest as lessor in all leases affecting said Real Estate; (4) all buildings, structures, improvements, fixtures, attachments, appliances, irrigation equipment, machinery and other articles now or hereafter erected on, affixed or attached to, or located in or on said Real Estate which are real property, and all substitutions, replacements, additions and accessions thereof or thereto; (5) all rents, issues, profits, royalties, bonuses, income and other benefits derived from or produced by said Real Estate (subject, however, to the assignment of rents and profits to Collateral Agent or Mortgagee herein); and (6) all right, title, estate, interest, and other claim or demand, including, without limitation, all claims or demands to the proceeds of all insurance now or hereafter in effect with respect to said Real Estate, which Mortgagor now has or may hereafter acquire in said Real Estate, and all awards made for the taking by condemnation or the power of eminent domain, or by any proceeding or purchase in lieu thereof, of the whole or any part of said Real Estate.

II.  Any and all fruit or nut bearing bushes, trees or vines presently or hereafter located on the above described Real Estate.  Mortgagor hereby agrees, acknowledges and confirms that such fruit or nut bearing bushes, trees or vines are part of the "real estate" comprising the above described Real Estate and will remain a part of the above described Real Estate throughout the term of the loan made by Mortgagee to Mortgagor that is secured by this Mortgage.

III.  The Mortgagor's interest as lessor in all leases (including, but not limited to, oil, gas and mineral leases) now or hereafter affecting the above described Real Estate or any part thereof.

IV.  Certificates numbered n/a representing 0 shares of the capital stock of n/a and the water rights represented thereby (if no entries, this granting clause is inapplicable).

**AND ALSO,** Mortgagor, as debtor, irrevocably grants and assigns to Collateral Agent for the benefit of Mortgagee, as secured party, a security interest in all of the following collateral which is personal property now or hereafter owned by Mortgagor or in which Mortgagor now or hereafter has any rights and which is now or hereafter located on or at, or affixed or attached to, or produced from, or used in connection with said Real Estate, including but not limited to:  All personal property described in <u>Exhibit B</u> attached hereto and made a part hereof; and articles of personal or mixed property of every kind and nature whatsoever, including, without limitation, all (a) goods, including without limitation, equipment and machinery (excluding, however, automobiles, trucks, tractors, trailers, wheeled vehicles, planting and tillage equipment), watering and irrigation apparatus, pumps, motors, generators, pipes, center pivot irrigators and sprinklers, windmills, fences, fixtures, fittings, appliances, farm products, crops growing or to be

Initials _DL_ _HOC_ _____

grown, timber standing or to be cut, minerals or the like (including oil and gas), raw materials, inventory and work in process; (b) all water stock and water rights and, to the extent listed on the attached <u>Exhibit "B"</u>, all investment property, including without limitation, certificated and uncertificated securities, securities entitlements, securities accounts and commodities accounts, including all stock, bonds and commodities contracts; (c) all permits and licenses used in the operation of the Real Estate and, to the extent listed on the attached <u>Exhibit "B"</u>, general intangibles, including without limitation payment intangibles and software;   (d) accounts, including without limitation all of Mortgagor's right to any payment arising out of the sale, lease or license of all kinds of tangible and intangible personal property, contract rights (whether now existing or arising in the future), general intangibles, instruments, documents, chattel paper, accounts receivable, deposits, fees, charges and other payments, income and cash receipts that are otherwise described in this paragraph; (e) personal property of the same general kind or class as otherwise described in this paragraph which Mortgagor may now own or hereafter acquire, wherever located, used or usable in the operation of or relating to the Real Estate; and all products and proceeds from the sale or other disposal thereof, including, without limitation, all payments under any insurance policies, substitutions and replacements, additions, accessions of or to said collateral  and any indemnity, warranty or guaranty relating to any of the foregoing.   All of the foregoing property shall hereinafter be collectively referred to as the "Collateral."  The Real Estate, the items in paragraphs II, III and IV above, and the Collateral shall hereinafter be collectively referred to as the "Property."  PROVIDED HOWEVER, that nothing in this Mortgage shall prevent Mortgagor from obtaining secured crop financing which may include the perfection of a lien by the crop lender on the crops growing or to be grown for a period not to exceed the beginning of the next crop year.  If Mortgagor exercises its right to place a single crop lien on the crops grown or to be grown on the Real Estate, such crop lien shall automatically be a first superior lien to the lien on such crop created hereby without the need for any consent or subordination from Collateral Agent or Mortgagee.

**TO HAVE AND TO HOLD** the same unto the Collateral Agent for the benefit of Mortgagee, their successors and assigns, forever.

**PROVIDED, ALWAYS,** that if the Mortgagor, his heirs, representatives, successors and assigns, shall pay unto the Mortgagee, its successors and assigns, the said sum of money mentioned in the Note and the interest thereon at the times and place and in the manner specified in the Note or Credit Agreement, and all other sums that may become due and owing to the Collateral Agent or Mortgagee pursuant to any of the terms, covenants and conditions hereof, and perform all the conditions and covenants contained in this Mortgage, then these presents and the estate hereby granted shall cease, determine and be void and shall be released by the Collateral Agent or Mortgagee at the expense of the Mortgagor, otherwise to remain in full force and effect.

**AND SUBJECT** to the covenants and conditions hereinafter set forth.

**FIRST.**  The Mortgagor hereby covenants and agrees, to the extent permitted by law, as follows:  **(a)** to pay promptly when due the principal and interest and other sums of money provided for in the Note, Credit Agreement and in this Mortgage, or either; **(b)** to pay all taxes, assessments and other charges (including ditch, canal, reservoir, or other water charges, taxes

Initials

or assessments) imposed by law upon the Property, the Collateral Agent's or Mortgagee's interest therein, or upon the Mortgage or the Note; provided however, in the event of the passage of any law changing the laws for the taxation of mortgages or debts secured by mortgages so as to affect this Mortgage, the entire indebtedness secured hereby shall, at the option of the Collateral Agent or Mortgagee, become due and payable; (c) to keep the Property and improvements on the Real Estate in good condition and repair and not to commit or suffer waste thereof, and except as authorized in any schedule annexed hereto and forming a part hereof, neither to remove nor permit the removal of any timber, buildings, oil, gas, minerals, stone, rock, clay, fertilizer, gravel or top soil without the prior written consent of the Collateral Agent or Mortgagee; (d) to maintain and deliver to the Collateral Agent or Mortgagee policies of insurance against such hazards on the buildings now or hereafter located on the Property as the Collateral Agent or Mortgagee may from time to time require, in such companies and amounts and with such loss payable clauses as shall be satisfactory to the Collateral Agent or Mortgagee; in the event of loss the Collateral Agent or Mortgagee is expressly authorized to settle or compromise claims under said policies and the proceeds shall be paid to the Collateral Agent and/or Mortgagee who may apply same or any part thereof on the indebtedness secured hereby or towards the reconstruction or repair of said buildings or release same to the Mortgagor; (e) to pay any lien, claim or charge against the Real Estate which might take precedence over the lien hereof; (f) to pay on demand all legal expenses, title searches, or attorney's fees reasonably incurred or paid by the Collateral Agent or Mortgagee to collect the Note or foreclose or protect the lien of the Mortgage; (g) in the event Mortgagor shall fail to comply with the provisions of (a) through (f) above, the Collateral Agent or Mortgagee may take such action as is necessary to remedy such failure and all sums paid by the Collateral Agent or Mortgagee pursuant hereto with interest at the rate hereinafter provided shall constitute a lien upon the Property, shall be secured by this Mortgage, and shall be immediately due and repayable to the Collateral Agent or Mortgagee; (h) not to sell the Real Estate or any portion thereof, or, if the Mortgagor is a corporation not more than 0.00% of its corporate stock shall be sold, traded or disposed of to persons other than the present owners prior to the time the indebtedness secured hereby shall have been reduced (exclusive of prepayments not permitted by the Note) to $0.00; (i) if the Real Estate or any portion thereof shall be taken or damaged under the power of eminent domain, the award for any property so taken or damaged (including severance damages to the remaining property) shall be paid to the Collateral Agent or Mortgagee and applied in full or in part at the option of the Collateral Agent or Mortgagee in reduction of the indebtedness hereby secured; (j) the Collateral Agent or Mortgagee shall have the right to inspect the Property at such reasonable times as the Collateral Agent or Mortgagee may desire to determine the Mortgagor's compliance with the covenants contained in this Mortgage; (k) the Collateral Agent or Mortgagee may release from the lien hereof any part of the above described Property without requiring any consideration therefor, and (l) Mortgagor is lawfully seized of said Real Estate in fee simple, the same is free from encumbrances except as may otherwise be specifically noted herein or waived in writing by the Collateral Agent or Mortgagee, Mortgagor will execute or procure any further necessary assurances of title and does hereby warrant generally the title to said Real Estate and will forever defend the same against the claims and demands of all persons whomsoever, and his separate estate, whether vested, contingent or in expectancy, is hereby conveyed and he does hereby expressly waive, release and relinquish all rights and benefits of any homestead, dower, curtesy, appraisement, exemption and stay laws of this state. It is agreed that the interest provided for in sub-section

7    Initials _____

(g) above shall be the rate set forth in the Note or Credit Agreement as the interest rate in effect after an event of default or the highest lawful rate permitted by contract under applicable law, whichever is less.

SECOND.  Mortgagor agrees that all of said Property which is erected on, affixed or attached to, or located in or on said Real Estate shall be deemed to be real property and a part of said real Estate.  No fixtures or equipment (including watering and irrigation apparatus) shall be removed from said Real Estate without the prior written consent of Collateral Agent or Mortgagee, except that Mortgagor shall have the right, without such consent, to remove and dispose of free from the security interest hereof such fixtures and equipment as may from time to time become worn out or obsolete, provided that Mortgagor shall, simultaneously with or prior to such removal, replace such removed fixtures or equipment with replacement fixtures or equipment having a value, quality and utility at least equal to the removed fixtures or equipment. All agreements of Mortgagor herein, and all rights of Collateral Agent or Mortgagee herein, relating to said Real Estate shall apply to said Property whether or not expressly referred to herein.  This Mortgage is a financing statement and covers property which is or is to become fixtures and is to be recorded in the real estate records.  Mortgagor is the record owner of said Real Estate.

THIRD.  If the Mortgagor shall default in the payment of the Note or in the performance of any of the covenants or agreements herein or in the Note, Credit Agreement or in any agreement collateral hereto contained, or if the then owner of the Property shall make an assignment for the benefit of creditors or shall file a petition for relief under the Bankruptcy Code of 1978, as amended, or under any similar statute, or shall be adjudicated bankrupt or insolvent, or if any receiver, liquidator or trustee shall be appointed for such then owner or any of his property, then in such event, the entire indebtedness hereby secured shall, at the option of the Collateral Agent or Mortgagee and without notice to the Mortgagor, be due and collectible at once by judicial foreclosure proceedings or as otherwise provided by law, or, when available under applicable statutes or rules of practice, by advertisement and sale, and in such an event this provision shall be deemed as authorizing and constituting a power of sale as mentioned in said statutes or rules; that in addition to the rights and remedies herein, the Collateral Agent or Mortgagee is hereby authorized and empowered at its option to exercise forthwith and from time to time any further rights and remedies available to the Collateral Agent or Mortgagee under the laws of the state wherein the Property is situate, such as the right to collect the rents, issues and profits, or to have a receiver appointed to collect the same.

FOURTH.  The following schedules are annexed hereto and made a part hereof (if no entry, this section is inapplicable): Exhibit "A" Legal Description and Exhibit "B" Personal Property.

FIFTH.  Mortgagor acknowledges that his/her current financial position is an important factor in Mortgagee's decision to advance the funds represented by the aforementioned Note. Mortgagor therefore has agreed, in order to provide assurance to Collateral Agent and Mortgagee with regard to Mortgagor's financial position, that it shall be an event of default for Mortgagor to allow any lien or encumbrance other than this Mortgage and the lien for taxes which are not yet due and payable to be placed on all or any part of the Real Estate described

8

Initials

above and allowed to remain a lien for 30 day(s) EXCEPT a lien junior and inferior to this Mortgage may be placed on all or a part of said Real Estate in favor of N/A in a principal amount not to exceed ZERO DOLLARS ($0) to be placed of record no later than N/A.

    **SIXTH.** The covenants herein contained shall bind, and the benefits and advantages thereof shall inure to, the respective heirs, executors, administrators, successors, and assigns of the parties hereto. In this Mortgage, unless the context otherwise requires, words in the singular number include the plural and in the plural include the singular, and words in the masculine gender include the feminine and the neuter. Whenever the term "Mortgagor" shall include more than one person or entity, their liability hereunder shall be joint and several.

    **SEVENTH.** Mortgagor shall not suffer any waste of the Property and will not permit or conduct either the generation, treatment, storage or disposal of hazardous waste, as defined in the Resource Conservation and Recovery Act, or the disposal on the Real Estate of petroleum or any hazardous substance, as defined in the Comprehensive Environmental Response, Compensation, and Liability Act, and will perform all remedial actions reasonably necessary as the result of the presence of any such hazardous wastes, petroleum or hazardous substances on, at or near the Real Estate. Notwithstanding any terms of the loan documents to the contrary, Mortgagor shall be personally liable for and hereby agrees to defend, indemnify, and hold Mortgagee, its directors, officers, employees, agents, successors and assigns harmless from all loss, cost, damage, claim, liability and expense in connection with the falsity in any material respect of the covenants contained herein or in connection with any and all Pre-Foreclosure Transfer Environmental Losses, including but not limited to: (i) loss, liability, damage, expense or claim arising from the imposition or recording of a lien, the incurring of costs of required repairs, clean up or detoxification and removal under any Laws with respect to the Property or liability to any third party in connection with any violation of Laws, (ii) other loss, liability, damage, expense or claim which may be incurred by or asserted against Mortgagee directly or indirectly resulting from the presence on or under, or the discharge, emission or release from the Property into or upon the land, atmosphere, or any watercourse, body of surface or subsurface water or wetland, arising from the installation, use, generation, manufacture, treatment, handling, refining, production, processing, storage, removal, clean up or disposal of any Hazardous Materials or Wastes whether or not caused by Mortgagor (all of the foregoing are hereafter referred to as "Hazardous Substance Activity"), (iii) loss of value of the Property as a result of the presence of Hazardous Materials or Wastes in, on, or under the Premises or any such lien, clean up, detoxification, loss, liability, damage, expense or claim or a failure or defect in title occasioned by any Hazardous Materials or Wastes or Laws and (iv) foreseeable and unforeseeable incidental and consequential damages. As used in this paragraph, "Pre-Foreclosure Transfer Environmental Losses" means losses suffered or incurred by Mortgagee prior to a Foreclosure Transfer (defined below) that arise out of or result from (i) the occurrence, at any time prior to a Foreclosure Transfer, of any Hazardous Substance Activity; (ii) any investigation, inquiry, order, hearing, action, or other proceeding by or before any governmental agency in connection with any Hazardous Substance Activity occurring or allegedly occurring at any time prior to a Foreclosure Transfer; or (iii) any claim, demand or cause of action, or any action or other proceeding, whether meritorious or not, brought or asserted against Mortgagee which relates to, arises from or is based on any of the matters described in clauses (i), or (ii) hereof, or any allegation of any such matters. As used in this

9                                                           Initials

paragraph, the phrase "at any time prior to a Foreclosure Transfer" includes the period between the time of Mortgagor's disposition of the Premises and the time of a Foreclosure Transfer (in the event that Mortgagor disposes of the Premises prior to a Foreclosure Transfer), as well as the period during which Mortgagor holds title to the Premises. A "Foreclosure Transfer" means the transfer of title to all or any part of the Premises at a foreclosure sale under this Deed of Trust, either pursuant to judicial decree or the power of sale contained in the Deed of Trust, or by deed in lieu of such foreclosure. As used in this paragraph, the phrase "Laws" means any federal, state or local laws, rules or regulations (whether now existing or hereinafter enacted or promulgated) including, without limitation, the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.*, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 *et seq.*, and the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901 *et seq.*, and any similar state laws, as well as any judicial or administrative interpretation thereof, including any judicial or administrative orders or judgments. As used in this paragraph, the term "Hazardous Materials or Wastes" shall mean any hazardous or toxic materials, pollutants, chemicals, mold or contaminants, including without limitation asbestos, polychlorinated biphenyls (PCBs) and petroleum products as defined, determined or identified as such in any Laws, as defined herein. Mortgagor shall also be liable for compliance (and for costs associated therewith) with any directive or order by any governmental entity relating to the presence of any such hazardous waste, petroleum or hazardous substance on, at, or near the Real Estate. Mortgagor will deliver promptly to the Mortgagee (i) copies of any documents received from the United States Environmental Protection Agency and/or any state, county or municipal environmental or health agency concerning the Mortgagor's operations upon the Real Estate; and (ii) copies of any documents submitted by the Mortgagor to the United States Environmental Protection Agency and/or any state, county or municipal environmental or health agency concerning operations on the Real Estate. Mortgagor shall also be liable for compliance (and for costs associated therewith) with any directive or order by any governmental entity relating to the presence of any such hazardous waste, petroleum or hazardous substance on, at, or near the Real Estate. Mortgagor will deliver promptly to the Collateral Agent or Mortgagee (i) copies of any documents received from the United States Environmental Protection Agency and/or any state, county or municipal environmental or health agency concerning the Mortgagor's operations upon the Real Estate and (ii) copies of any documents submitted by the Mortgagor to the United States Environmental Protection Agency and/or any state, county or municipal environmental or health agency concerning operations on the Real Estate.

     **EIGHTH.**  Mortgagor, its successors and assigns and each of them, represent and warrant that the Property involved in this transaction does not represent the proceeds of some form of unlawful activity under any state, federal or foreign law.

     **NINTH.**  This Mortgage constitutes a security agreement within the meaning of the Uniform Commercial Code ("UCC") as in effect from time to time in the state where the Collateral is located except to the extent the UCC provides for the application of the law of the state of location of the Mortgagor in which event the UCC as in effect from time to time, in such state shall apply, with respect to any part of the Property which may now or hereafter be characterized by law as personal property, and in the event of any default under this Mortgage which continues beyond the applicable notice and cure period, if any, the Collateral Agent or

10

Initials _____

Mortgagee shall have all the rights and remedies of a secured party under the UCC as in effect from time to time, as well as all other rights and remedies available hereunder or under this Mortgage at law or in equity. Mortgagor authorizes Collateral Agent or Mortgagee to file one or more financing statements and continuation statements, at Mortgagor's expense, describing the Collateral and hereby ratifies any such financing statement or continuation statement previously filed by Collateral Agent or Mortgagee. Mortgagor will, from time to time, within ten (10) days after request by the Collateral Agent or Mortgagee, execute, acknowledge and deliver any document that the Collateral Agent or Mortgagee might request in order to perfect, protect, preserve, continue, extend or maintain the security interest created by and the priority of this Mortgage and will, on demand, pay any expenses incurred by the Collateral Agent or Mortgagee in the preparation, execution and filing of any such documents. Mortgagor represents and warrants that: (a) all Collateral is located in the state in which the Real Estate is located; (b) Mortgagor's chief executive office or principal residence is Mortgagor's address set forth in the first paragraph of this Mortgage; (c) Mortgagor's state of organization, if applicable, is as set forth in the first paragraph of this Mortgage; and (d) Mortgagor's exact legal name is as set forth in the first paragraph of this Mortgage.

**TENTH.** This Mortgage shall be governed by and construed and interpreted in accordance with the internal laws of the state in which the Real Estate is located, except and only to the extent the UCC provides otherwise.

**ELEVENTH** Mortgagor, its successors and assigns and each of them, represent and warrant that either:

(a) The Property does not contain and will not be cultivated to grow any variety of perennial crops, or plants, vines, trees, nuts and/or fruit that produce crops in more than one crop year (hereinafter "Permanent Plantings") that is or may be subject to intellectual property rights under U.S. or foreign patent, copyright or trademark laws, the Plant Variety Protection Act or similar laws or subject to license from the holder of any such intellectual property rights (all of the foregoing being hereinafter referred to as "IP Rights"); or

(b) To the extent the Property does contain or in the future is cultivated to grow any variety of Permanent Plantings that is or may be subject to IP Rights, Mortgagor represents and warrants that Mortgagor is or shall be the owner of such IP Rights free and clear of any claim, right, title, interest or lien of any other person, Mortgagor has or shall notify Mortgagee in writing of the existence of such IP Rights and Mortgagor does hereby, has or shall grant Mortgagee a security interest in and a lien upon all of Mortgagor's right, title and interest in, to and under, whether now owned or hereafter created in IP Rights, all cash and non-cash proceeds and products of the IP Rights and all causes of action, past, present and future for infringement, misappropriation or dilution of any of the IP Rights or unfair competition regarding the same.

**TWELVETH.** THE NOTE EVIDENCES A DEBT CREATED BY ONE OR MORE DISBURSEMENTS MADE BY THE MORTGAGEE TO THE MORTGAGOR TO FINANCE THE COST OF THE CONSTRUCTION OF CERTAIN IMPROVEMENTS UPON THE REAL ESTATE IN ACCORDANCE WITH THE PROVISIONS OF A BUILDING AND LOAN AGREEMENT OF EVEN DATE HEREWITH BETWEEN THE MORTGAGOR AND THE MORTGAGEE (THE

11

initials

"LOAN AGREEMENT"), AND THIS MORTGAGE IS A CONSTRUCTION MORTGAGE AS SUCH TERM IS DEFINED IN SECTION 9-334(H) OF THE UNIFORM COMMERCIAL CODE AS ADOPTED BY THE STATE OF WASHINGTON. THE TERMS AND CONDITIONS RECITED AND SET FORTH IN THE LOAN AGREEMENT ARE FULLY INCORPORATED IN THIS MORTGAGE AND MADE A PART HEREOF, AND A DEFAULT UNDER ANY OF THE CONDITIONS OR PROVISIONS OF THE LOAN AGREEMENT SHALL CONSTITUTE A DEFAULT HEREUNDER.  UPON THE OCCURRENCE OF ANY SUCH DEFAULT, THE HOLDER OF THE NOTE MAY AT ITS OPTION DECLARE THE INDEBTEDNESS SECURED HEREBY IMMEDIATELY DUE AND PAYABLE, OR COMPLETE THE CONSTRUCTION OF SAID IMPROVEMENTS AND ENTER INTO THE NECESSARY CONTRACTS THEREFOR, IN WHICH CASE ALL MONEY EXPENDED SHALL BE SO MUCH ADDITIONAL INDEBTEDNESS SECURED HEREBY AND ANY MONEY EXPENDED IN EXCESS OF THE AMOUNT OF THE ORIGINAL PRINCIPAL SHALL BE IMMEDIATELY DUE AND PAYABLE WITH INTEREST UNTIL PAID AT THE APPLICABLE RATE OF INTEREST SET FORTH IN THE NOTE.  UPON COMPLETION OF THE IMPROVEMENTS DESCRIBED IN THE LOAN AGREEMENT FREE AND CLEAR OF MECHANIC'S LIEN CLAIMS, AND UPON COMPLIANCE WITH ALL OF THE TERMS, CONDITIONS AND COVENANTS OF THE LOAN AGREEMENT, THE LOAN AGREEMENT AND THE TERMS OF THIS SECTION SHALL BECOME NULL AND VOID AND OF NO FURTHER FORCE AND EFFECT.  IN THE EVENT OF A CONFLICT BETWEEN THE TERMS OF THE LOAN AGREEMENT AND THIS MORTGAGE, THE PROVISIONS OF THE LOAN AGREEMENT SHALL APPLY AND TAKE PRECEDENCE OVER THIS MORTGAGE.

THIRTEENTH.      Notwithstanding anything to the contrary contained herein, the parties agree that: (a) the Property secure the Hedging Obligations on a pari passu basis with the other indebtedness evidenced by the Note; and (b) in the event of any foreclosure or other realization on any Property, for purposes of determining the amount of Property proceeds allocable to the Beneficiary who is party to any Hedging Obligation ("Swap Lender"), the amount of the Hedging Obligations then due such Swap Lender shall be treated as if such Hedging Obligations were unpaid principal under the Note.

FOURTEENTH.      Easterday Farms Produce, Co., a Washington corporation is executing this document solely for the purpose of granting a security interest in personal property to Mortgagee and to obligate itself to the Security Agreement and Financing Statement portions hereof. Easterday Farms Produce, Co. does not own an interest in the Real Estate and therefore does not make any representations or warranties with regard to the Real Estate, but only with regard to the personal property herein.

**ORAL AGREEMENTS, PROMISES OR COMMITMENTS TO:  (1) LOAN MONEY, (2) EXTEND CREDIT, (3) MODIFY OR AMEND ANY TERMS OF THE LOAN DOCUMENTS, (4) RELEASE ANY GUARANTOR, (5) FORBEAR FROM ENFORCING REPAYMENT OF THE LOAN OR THE EXERCISE OF ANY REMEDY UNDER THE LOAN DOCUMENTS, OR (6) MAKE ANY OTHER FINANCIAL ACCOMMODATION PERTAINING TO THE LOAN ARE ALL UNENFORCEABLE UNDER WASHINGTON LAW.**

12

Initials _____

**IN WITNESS WHEREOF,** each of the undersigned has signed, sealed and delivered this Mortgage as of the day, month and year first above written.

**Easterday Farms Produce, Co., a Washington corporation**

By: _____
    Jody Easterday, President

**3E PROPERTIES, a Washington general partnership**

By: _____
    Jody Easterday, Partner

By: _____
    Cody A. Easterday, Partner

By: _____
    Debby Easterday, Partner

By: _____
    Gale A. Easterday, Partner

By: _____
    Karen L. Easterday, Partner

_____
Gale Easterday

_____
Karen Easterday

_____
Cody Easterday

13                              Initials _____

_____
Debby Easterday

_____
Jody Easterday

STATE OF WASHINGTON }
                    } ss.
COUNTY OF Benton    }

On this 14th day of September, 2009, before me the undersigned notary public in and for the State of Washington, duly commissioned and sworn, personally appeared Jody Easterday, President of Easterday Farms Produce Co., a Washington Corporation, and the individual that executed the foregoing instrument, and acknowledged the said instrument to be the free and voluntary act and deed of said entity, for the uses and purposes therein mention, and on oath stated that they were authorized to execute the said instrument.

Witness my hand and official seal hereto affixed the day and year first above written.

_____
Bonnie Thompson
Notary Public in and for the State of Washington
Residing at Kennewick.    My commission expires: 4-30-2011.

STATE OF WASHINGTON }
                    } ss.
COUNTY OF Benton    }

On this 14th day of September, 2009, before me the undersigned notary public in and for the State of Washington, duly commissioned and sworn, personally appeared Jody Easterday, Cody A. Easterday, Debby Easterday, Gale A. Easterday and Karen L. Easterday, Partners of 3E Properties, a Washington general partnership and the individuals that executed the foregoing instrument, and acknowledged the said instrument to be the free and voluntary act and deed of said entity, for the uses and purposes therein mention, and on oath stated that they were authorized to execute the said instrument.

Witness my hand and official seal hereto affixed the day and year first above written.

_____
Bonnie Thompson
Notary Public in and for the State of Washington
Residing at Kennewick.    My commission expires: 4-30-2011.

14

Initials _____

STATE OF WASHINGTON          )
                             ) SS:
COUNTY OF _Benton_____  )

      I, __Bonnie Thompson_____, a notary public in and for said County and State, do hereby certify that on this_14th_day of ___September____, 20_09_, personally appeared before me the within named __Gale A. Easterday_____ to me known to be the individual(s) described in and who executed and whose name(s) is (are) subscribed to the within and foregoing instrument, and duly acknowledged to me that __he__ signed and executed the same as __his__ free and voluntary act and deed, for the uses and purposes therein mentioned.

      GIVEN under my hand and official seal, the day and year in this certificate first above written.

(SEAL)

                                    _Bonnie Thompson_____
                                    Notary Public

My commission expires:    4-30-2011

[If executed by corporation, corporate form of acknowledgment must be attached]

Recorded at the request of:

15

Initials _De Jfse_

STATE OF WASHINGTON          )
                             ) SS:
COUNTY OF __Benton_____ )

      I, __Bonnie Thompson_____, a notary public in and for said County and State, do hereby certify that on this 14th day of ___September___, 2009, personally appeared before me the within named __Karen L. Easterday_____ to me known to be the individual(s) described in and who executed and whose name(s) is (are) subscribed to the within and foregoing instrument, and duly acknowledged to me that __she__ signed and executed the same as __her__ free and voluntary act and deed, for the uses and purposes therein mentioned.

      GIVEN under my hand and official seal, the day and year in this certificate first above written.

(SEAL)

                                     _Bonnie Thompson_____
                                     Notary Public

My commission expires: 4-30-2011.

16

Initials _____

STATE OF WASHINGTON         )
                                   ) SS:

COUNTY OF __Benton_____   )

        I, __Bonnie Thompson_____, a notary public in and for said County and State, do hereby certify that on this 14th day of __September_____, 2011, personally appeared before me the within named __Cody A. Easterday_____ to me known to be the individual(s) described in and who executed and whose name(s) is (are) subscribed to the within and foregoing instrument, and duly acknowledged to me that __he___ signed and executed the same as __his___ free and voluntary act and deed, for the uses and purposes therein mentioned.

        GIVEN under my hand and official seal, the day and year in this certificate first above written.

(SEAL)

                                          _Bonnie Thompson_____
                                          Notary Public

My commission expires: 4-30-2011.

17

Initials _____

STATE OF WASHINGTON        )
                                          ) SS:

COUNTY OF __Benton_____ )

    I, __Bonnie Thompson_____, a notary public in and for said County and State, do hereby certify that on this 14th day of __September_____, 2011_, personally appeared before me the within named __Debby Easterday_____ to me known to be the individual(s) described in and who executed and whose name(s) is (are) subscribed to the within and foregoing instrument, and duly acknowledged to me that __she__ signed and executed the same as __her__ free and voluntary act and deed, for the uses and purposes therein mentioned.

    GIVEN under my hand and official seal, the day and year in this certificate first above written.

(SEAL)

                                           _Bonnie Thompson_
                                           Notary Public

My commission expires:  4-30-2011.

18

Initials _____

STATE OF WASHINGTON )
) SS:
COUNTY OF __Benton__ )

I, __Bonnie Thompson_____, a notary public in and for said County and State, do hereby certify that on this 14th day of ___September,_____ , 2009 , personally appeared before me the within named __Jody Easterday_____ to me known to be the individual(s) described in and who executed and whose name(s) is (are) subscribed to the within and foregoing instrument, and duly acknowledged to me that ___she___ signed and executed the same as ___her___ free and voluntary act and deed, for the uses and purposes therein mentioned.

GIVEN under my hand and official seal, the day and year in this certificate first above written.

(SEAL)

Bonnie Thompson
Notary Public

My commission expires: 4-30-2011.

RVSD 06-18-08
L:\MTG_DOT\SERIES 400\RLOC\WA_RLOC_MTG.DOC
J:\LOANS\413058 & 413059 - EASTERDAY\413058 DRAFTED DOCS\WA_RLOC_MTG.DOC

19

Initials

**Exhibit "A"**

Assessor's property tax parcel or account number: ████1-017 and ████0-040

Legal Description

The land referred to in this commitment is described as follows:

PARCEL A:

All of Blocks 13 and 14, Northern Pacific Addition to the City of Pasco, according to the plat thereof recorded in Volume "B" of Plats, page 60, records of Franklin County, Washington;
TOGETHER WITH the south half of vacated Court Street adjoining said premises, vacated by City of Pasco Ordinance No. 3685, recorded August 19, 2004 under Recording No. 1649527, which attached by operation of law

PARCEL B:

That portion of the Southwest quarter of Section 8, Township 9 North, Range 30 East, W.M., Franklin County, Washington, described more particularly as follows:

Commencing at the Southwest corner of said Section 8, said corner being South 04°14'13" West 5471.86 feet from the Northwest corner of said section;
thence South 89°23'28" East along the South line of said section 782.49 feet to the True Point of Beginning:

thence North 01°05'08" East 508.87 feet to the beginning of a curve to the left, the radius point of which bears North 88°54'54" West 740.00 feet;
thence Northwesterly along said curve 159.33 feet through a central angle of 12°20'12" to a point that is 40.00 perpendicular to the centerline of the railroad siding;
thence continuing along said curve 41.78 feet, through a central angle of 03°14'00" to the centerline of the railroad siding;
thence North 60°28'07" East 2.11 feet to the Southwest corner of the parcel shown on that record survey filed in Volume 2 of Surveys at page 347;
thence North 60°28'07" East along the South line of said parcel 270.03 feet to the beginning of a curve to the left; the radius point of which bears North 29°31'53" West 716.20 feet;
thence Northeasterly along said curve and said Southerly line 832.73 feet through a central angle of 66°37'44" to the terminus of said curve;
thence North 71°13'27" East along said Southerly line 46.72 feet to the Southeast corner of said parcel and a point on the Westerly right-of-way line of Highway 395;
thence South 13°17'39" East along said Westerly right-of-way line 68.69 feet;
thence South 04°20'11" West 1500.00 feet to a point on the South line of said Section 8;
thence North 89°23'28" West 528.73 feet to the True Point of Beginning;

TOGETHER WITH that portion of the Northeast quarter of the Southwest quarter of said Section 8, lying Westerly of SR 395.

20

Initials _D JHoe_

## Exhibit "B"

Personal Property

No specific additional collateral

21

Initials _____